**DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

SHAWN MCCONNELL,           )
                                        )
           Plaintiff,         )         Case No. 22 C 4114
                                          )
          v.                 )
                                          )
ARMY REVIEW BOARDS AGENCY,   )
                                          )
           Defendant.      )

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Shawn McConnell ("Plaintiff") brings this action against the Army Review Boards Agency ("Defendant" or "ARBA") asserting claims arising from Plaintiff's mandatory retirement from the Army Reserve. Defendant has moved to dismiss under Federal Rule of Procedure 12(b)(6) for failure to state a claim. For the following reasons, Defendant's motion to dismiss is granted.

**BACKGROUND[1]**

### I. Plaintiff's Enlistment and Service in the Military

Plaintiff enlisted in the Illinois Army National Guard as an infantryman in March 1984 at the age of 17. (Compl. ¶ 2.a.) Plaintiff was sent to Army helicopter flight school and was qualified to fly the UH-60 Blackhawk helicopter. (*Id.*) For over ten years, Plaintiff flew in the armed forces to gain experience in dangerous and risky situations. (*Id.*)

---

[1] The following factual background is taken from the allegations in Plaintiff's *pro se* complaint (ECF No. 1), which are taken as true and construed in Plaintiff's favor for purposes of Defendant's motions to dismiss. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The Court also considers "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Plaintiff's brief opposing dismissal (ECF No. 36), so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted).

By September 11, 2001, Plaintiff had been employed as a civilian airline pilot for nearly a year and was one month from attaining the rank of aircraft captain, at which point his earnings would have significantly increased. (*Id*.) Plaintiff achieved unique distinctions as an airline pilot that he contends would have led to a promising career earning a lucrative income and a significant retirement benefit by age 55—his age at the time of filing this lawsuit. (*Id*.)

Around September 11, 2001, Plaintiff was mobilized to work full time in the Army Reserve. (*Id*.) After two and a half years, Plaintiff applied for full-time active duty in the Army Reserve's Active Guard Reserve ("AGR") program so that he could continue serving in the war effort. (*Id*.) Plaintiff joined the AGR program in April 2004 and moved his family from Illinois to Pennsylvania. (*Id*.) There Plaintiff served in human resources until 2006, when he received the highest possible performance ratings and was consequently transferred to Fort Knox, Kentucky, to serve in the new Army Reserve aviation general officer command. (*Id*.) Around that time, Plaintiff was promoted to the rank of lieutenant colonel (*id*.), which established Plaintiff's mandatory removal date ("MRD") as June 30, 2014, based on 28 years of commissioned service in accordance with 10 U.S.C. § 14507(a). (ECF No. 1-1 at p. 23.[2])

After three years, Plaintiff was assigned to serve as the detailed inspector general and received the highest possible performance rating during his first year. (Compl. ¶ 2.a.) After completing the standard three-year tour as a detailed inspector general, Plaintiff was transferred to Fort McCoy, Wisconsin, to serve as an executive officer. (*Id*.) While there, Plaintiff completed his master's degree in business and received the highest possible performance rating. (*Id*.) Because of his success, Plaintiff was upgraded to the position of deputy brigade commander and was rated the best in his division. (*Id*.)

---

[2] For ease of reference, the Court cites to the ECF pagination of the exhibits attached to the complaint.

By 2013, Plaintiff was performing at the top of his career and was anticipating promotion to colonel—all he needed was a deployment to be competitive for promotion, yet he had never received one due to his five previous successive assignments in non-deploying general officer headquarters commands. (*Id*. ¶ 2.b.) Plaintiff's brigade commander notified him that he would deploy to Afghanistan to serve as military advisor to Afghani combat unit battalion and brigade commanders. (*Id*.) Plaintiff anticipated that he would also be promoted to colonel with his recent high ratings and possibly extend service beyond his MRD, just as had his predecessor in his position. (*Id*.) Ultimately, however, none of these anticipated events occurred.

##    II.    Plaintiff's Mandatory Retirement and Efforts to Achieve AFS Retirement

On June 30, 2014, Plaintiff was honorably discharged and released from active duty ("REFRAD") from the Army Reserve as an AGR officer. (*Id*. ¶ 1.) Plaintiff had 30 years of continuous service at that time, including 28 years of officer service and approximately 15.5 years of active service that counted toward active federal service ("AFS") retirement. (*Id*. ¶ 2.c.) Plaintiff was 47 years old. (*Id*. ¶ 3.b.) The Army Reserve determined that Plaintiff was eligible for non-regular retired pay at age 60, which Plaintiff had earned by completing 20 years of qualifying service. (ECF No. 1-1 at p. 39.) An AFS retirement, by contrast, can only be achieved after completing 20 years of AFS. (Compl. ¶ 2.c.); *see also* 10 U.S.C. § 7311.

Central to Plaintiff's complaint is the difference between an AFS retirement and a non-regular retirement. While that difference is not made wholly clear in the complaint, the Court gleans that an AFS retirement is more desirable to Plaintiff than a non-regular retirement at age 60. An AFS retirement (also called a "full" or "regular" retirement) is a retirement pension based on the highest rank held while on active duty that is provided as soon as the servicemember leaves active service and includes tri-service medical care ("Tricare") benefits. (Pl.'s Resp. to

Def.'s Mot. to Dismiss ("Response" or "Resp.") 2, ECF No. 36.) A non-regular retirement is a lower retirement pension that does not begin until the servicemember reaches age 60. (*Id*.); *see also* 10 U.S.C. § 12731. Plaintiff contends that servicemembers who commit to full-time service, including AGR service, gain an advantage in their pension entitlements that compensates them for the civilian employment opportunities they forego when they choose full-time military service. (*Id*. at 2–3.)

Plaintiff claims that Defendant violated United States Department of Defense ("DoD") policies and United States Army regulations by not affording him the opportunity to reach an AFS retirement. (Compl. ¶ 2.c.) More specifically, Plaintiff points to paragraph 4.7 of DoD Directive 1205.18, published May 25, 2000 ("DoD Directive 1205.18"), which states,

> . . . AGR Programs in each Military Service *shall be administered as career programs that may lead to a military retirement after attaining the required years of active Federal Service*. Personnel may be placed in AGR status for occasional, one-time tours or for a probationary period established by the Secretary concerned. A probationary period shall not exceed 6 years. Continuation beyond the initial probationary period, *or service in AGR status for more than 6 years constitutes retention and shall require subsequent management under a career program*. The program shall commence not earlier than March 24, 1997.

DoD Directive 1205.18 ¶ 4.7 (emphasis added).[3]

Plaintiff claims that the phrase, "AGR Programs . . . shall be administered as career programs that may lead to a military retirement after attaining the required years of active Federal Service," together with the phrase, "service in AGR status for more than 6 years constitutes retention and shall require subsequent management under a career program[,]" places the burden on the Army Reserve (via the use of the mandatory word "shall") to manage a soldier with six or

---

[3] The parties refer, without explanation, to multiple different versions of DoD Directive 1205.18. The different versions use different paragraph numbering and, as explained below, language. There is no apparent material difference between the various versions. Accordingly, the Court refers herein to the version published May 25, 2000, which is the version that Plaintiff attaches to his complaint as part of his military record. (*See* ECF No. 1-1 at p. 88.)

more years in AGR status in such a way that the soldier is able to reach AFS retirement. (*Id*. ¶ 4.b.) Plaintiff alleges that the use of the word "may" is used in the permissive sense rather than a potential outcome that "could or could not happen." (*Id*.) Plaintiff alleges that he was retained on AGR status for over ten years—meaning he served over six continuous years on AGR status—yet was not "manage[d] under a career program" in a way that could allow Plaintiff to achieve AFS retirement as required in DoD Directive 1205.18. (*Id*. ¶ 2.c.) Plaintiff claims that the Army Reserve "cannot have it both ways[—Plaintiff] was either a career AGR Soldier, or they should have released [him] before [he] reached 6 years of AGR service." (*Id*. ¶ 4.b.) By not doing so, the Army Reserve allegedly violated DoD Directive 1205.18. (*Id*. ¶ 4.c.)

Plaintiff also points to Army Regulation 135-18, published November 1, 2004 ("AR 135-18"), which states, under the subsection "Objectives," "[t]his regulation provides for— . . . [e]ntry into the program of soldiers who may desire to serve only initial or occasional AGR tours, as well as soldiers who serve in a career status." AR 135-18 § 1-6(d); (*see also* Compl. ¶ 2.c.) Plaintiff alleges that AR 135-18 supports the understanding of "career" as meaning achieving AFS retirement. (Compl. ¶ 2.c.)

Plaintiff alleges that there were several ways the Army Reserve could have managed him under a career program—*i.e.*, given him the opportunity to achieve AFS retirement. First, Plaintiff's unit attempted to deploy him to Afghanistan (his preference) to be there for several years, which would have allowed Plaintiff to gain needed qualification and experience to be promoted to colonel. (*Id*. ¶ 2.d.) Promotion to colonel would have extended his MRD by two years, after which Plaintiff alleges he could either receive another extension or be deployed again for a few months until he reached 18 years of AFS. (*Id*.); *see also* 10 U.S.C. § 14507(b). An officer who attains 18 years of AFS reaches "sanctuary" and may continue to serve until he

reaches 20 years under 10 U.S.C. § 12646. (Resp. 3.) However, this option "turned out to be impossible" due to Plaintiff's brigade mission at the time "ramp[ing] up other units for deployment." (Compl. ¶ 2.d.)

Second, the Army Reserve could have deployed him as a part-time reservist until he "met a new promotion board or two and made Colonel." (*Id*.) Plaintiff alleges this was another method commonly used in this situation. (*Id*.)

Third, Plaintiff could have been retained under an exception to policy by the secretary of the Army. (*Id*.) Plaintiff asked human resources command ("HRC") for this remedy based on years of advice he received from senior leaders and managers at the Army Reserve command but was denied. (*Id*.)

Fourth, Plaintiff could have been reverted to warrant officer, which he could have done until over age 60. (*Id*.) Plaintiff could have served another 13 or more years as an army pilot in the AGR program. (*Id*.) When Plaintiff's request to HRC for an exception failed, his commanding general prepared Plaintiff to revert to warrant officer by allowing him to requalify as a pilot in the fall of 2013 by taking a certain qualification course. (*Id*. ¶ 2.e.) While there, Plaintiff received for the first time a new policy letter dated December 2012 requiring a soldier to ask for reversion to warrant officer before reaching within two years of MRD. (*Id*.) By December 2012, Plaintiff was already within 18 months of MRD, effectively excluding him from making a timely request without his knowledge. (*Id*.)

When Plaintiff asked the aviation officer and warrant officer career management teams at HRC if something could be done, they advised plaintiff that there was "no need for more pilots." (*Id*.) Plaintiff alleges this was false at the time because Plaintiff, as the senior-most personnel officer, had been in the position to know that the rate and volume of pilot retirements was high

due to deployment burnout. (*Id*.) This was also in the public news media at the time. (*Id*.)
Further, just six months after Plaintiff was REFRAD, the same aviation career management team
at HRC advertised the urgent need for qualified Army UH-60 Blackhawk pilots (like Plaintiff) to
return to active duty in the AGR program. (*Id*.) Plaintiff contends that releasing him as a
qualified pilot at that time was a waste of government resources spent training and developing
him. (*Id*.) Plaintiff alleges that his separation at the time was plainly not in the interests of the
Army. (*Id*.)

Once Plaintiff realized the MRD was not to be stopped, Plaintiff requested from Army
Reserve command a partial retirement under Temporary Early Release Authorization ("TERA"),
which affords partial immediate retirement to certain servicemembers with over 15, but less than
20, years of AFS. (*Id*. ¶ 2.f.) Plaintiff contends this would have been a fair condition under which
he could have been separated given the unique circumstances the Army Reserve put him in. (*Id*.)
The Army Reserve determined that Plaintiff was not qualified or eligible for this remedy. (*Id*.)
Plaintiff claims that such a determination did not, however, "release them from the requirement
to manage him to an Active-Duty (20 years of AFS with immediate annuity) career retirement."
(*Id*.) Plaintiff contends that "[t]his is the gravamen of my complaint that has been
unanswered/ignored by the ARBA to date." (*Id*.)

Plaintiff met with the senior executive service chief of staff of HRC to discuss Plaintiff's
situation. Plaintiff was granted $163,000 in separation pay, which will be taken from his
retirement pay when he reaches the age of 60. (*Id*.) Plaintiff alleges that this was an exceptional
act on their part because it is usually only afforded to servicemembers who are released before
retirement for medical disqualification or misconduct, which "shows they were fully aware of the

injustice of the matter." (*Id*.) Plaintiff spent his separation pay on lodging for his family for five months while looking for employment. (*Id*.)

### III.    Post-Retirement Appeals

In March of 2015, Plaintiff "appealed the matter" to the Army Board of Corrections to Military Records ("ABCMR") (*id*. ¶ 2.h.), a civilian board that is empowered under authority delegated to it by the Secretary of Defense to amend military records. 10 U.S.C. § 1552.[4] Plaintiff attaches to his complaint a copy of his March 2015 petition to the ABCMR ("Initial ABCMR Application"). (ECF No. 1 at p. 10.) Therein, Plaintiff requested that "the following error or injustice in the record be corrected as follows: . . . Provide a partial regular pension and permanent TRICARE [benefits] effective 30 June 2014 based on my over 15 years of Active Federal Service which included over 10 continuous years of AGR service." (*Id*. at p. 10.) Plaintiff stated that he "believe[d] the record to be in error or unjust for the following reasons:"

> In contrast to other career Soldiers, [he]: 1) was not warned or counseled as other AGR Soldiers had been about the possibility that [he] would reach MRD before a regular pension, 2) was retroactively excluded from continued service as a Warrant Officer by six (6) months, 3) was excluded from a board that would have qualified me for partial retirement under TERA by 16 days, 4) was denied by the Assistant Secretary an extension of [his] MRD or a partial pension after 10 years of seeing others provided similar remedies, and 5) was separated without a regular pension after having been retained in career AGR service beyond the six (6) year milestone requiring management into pension eligibility [in accordance with] DOD instructions and Army regulation.

(*Id*.) Among other things, Plaintiff quoted DoD Directive 1205.18 and argued, "<u>By allowing me to serve beyond probationary status and for over 6 years in the AGR program the Army assured me</u>

---

[4] Under 10 U.S.C. § 1552, the ABCMR may correct records "when the Secretary considers it necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1). The ABCMR "decide[s] cases on the evidence of record" and "is not an investigative body." 32 C.F.R. § 581.3(c)(2)(iii). "The applicant has the burden of proving an error or injustice by a preponderance of the evidence." 32 C.F.R. § 581.3(e)(2).

'management under a career program' that ' . . . leads to a military retirement." (*Id*. at pp. 11, 14 (emphasis original).)

The ABCMR subsequently notified Plaintiff that it had received an advisory opinion from the Army's office of the deputy chief of staff ("ODCS") which recommended disapproval of Plaintiff's Initial ABCMR Application. (ECF No. 1 at pp. 122–26.) The advisory opinion is attached to the complaint and reasoned, in part, that DoD Directive 1205.18 "states 'may,' rather than 'will' lead to a military retirement . . . because there can be no guarantee or statement of a service member's prequalification for retirement solely for entry into or continuation beyond the probationary period in the AGR Program; each member must attain 20 years of active Federal service in order to be qualified." (*Id*. at pp. 125–26.) The advisory opinion further stated, in pertinent part,

> LTC (Ret) McConnell states that he was denied by the Assistant Secretary of the Army for Manpower and Reserve Affairs [("ASA M&RA")] an extension of his MRD . . . after 10 years of seeing others provided similar remedies. LTC (Ret) McConnell also contends other AGR officers were afforded "MRD extensions and deployments that bridged them into sanctuary". While this contention may be true, individual personnel actions, including MRD extensions, are based upon the needs of the service, the match of an officer's qualifications to the requirement, the willingness of the officer to perform the required mission or service, and in some cases, the timing of the requirement with regard to the officer's career. As such, there are instances where all the needed criteria for an officer's MRD to be extended don't match up, and other officer's circumstances shouldn't be considered as precedents that will apply in all cases. As LTC (Ret) McConnell indicates, Mr. Karl F. Schneider, Acting [ASA M&RA], considered his request for . . . MRD extension, which presented the same or similar arguments as the instant appeal to the ABCMR. Mr. Schneider . . . disapproved his MRD extension request because he deemed LTC (Ret) McConnell's retention was not in the best interest of the Army.

(*Id*. at p. 125.)

Plaintiff submitted a rebuttal to the advisory opinion in which he argued in part,

> ODCS, G1 addresses . . . what I consider to be the heart of the matter. . . . In considering this one should know policies that establish the Service are not written to tell what cannot be done, but what can or should be done. Specifically, the ODCS,

> G1 opinion misses the point of the whole paragraph, which is to prescribe to the Services categories of AGR service for which Congress has funded, the third of which being AGR Soldiers chosen to be kept beyond 6 years. It goes on to stipulate that these candidates "shall" be deemed by the Service to be *able* to reach AFS retirement. In other words, the Services are allowed to keep an AGR Soldier beyond 6 years given that they (the Soldier) "may" reach AFS retirement in the *permissive* sense. The directive places the requirement to make this determination on the Services, not the Soldier – hence the nature of the directive is not to address Soldier pay, benefits, or retirement per se. In doing so, it protect[s] Soldiers from abuse by the Services by using the word "may" in the *permissive* sense, not the *conditional* sense as their opinion would have it. "May" does not mean "might" in the *conditional* sense because it is not speaking to the variable eligibility of the Soldier. If DOD had meant to allow for this, they would have added a fourth category to include "those who serve beyond 6 years without the possibility of reaching AFS retirement."

(ECF No. 1-1 at p. 17 (emphasis original).)

The ABCMR denied Plaintiff's Initial ABCMR Application by letter dated March 2, 2016 (the "Initial ABCMR Denial Letter"), which Plaintiff attaches to the complaint. (ECF No. 1-1 at p. 20.) The Initial ABCMR Denial Letter summarizes, for 17 pages, the evidence and argument that Plaintiff submitted before setting forth three pages of discussion and conclusions. In a section titled "Consideration of the Evidence," the ABCMR states, among other things,

> As he indicates, DOD Directive 1205.18, subject: FTS to the Reserve Components, states, "AGR programs in each Military Service will be administered as career programs that may lead to a military retirement after attaining the required years of AFS." It is important to note the guidance states "may" rather than "will" lead to a military retirement. This is because there can be no guarantee or statement of a Service member's prequalification for retirement solely for entry into or continuation beyond the probationary period in the AGR program. Each Service member must attain 20 years of AFS in order to be qualified for retirement based on sufficient length of service. Upon entry into the AGR Program, no AGR personnel are guaranteed an AFS retirement.

(*Id*. at p. 27.)

At multiple points, the Initial ABCMR Denial Letter summarizes Plaintiff's position regarding his interpretation of the language of DoD Directive 1205.18. (*See id*. at pp. 27–28, 32–34.) The Initial ABCMR Denial Letter further notes,

Army Regulation 140-30 (Active Duty in Support of the USAR and AGR Management) prescribes policy and procedures for selecting, assigning, attaching, using, managing, and administering USAR Soldiers on active duty in the AGR program. It establishes a personnel management system managing AGR Soldiers through selection for accession and continuation in the AGR program, promotion, and selection for schooling and training. Paragraph 6-1 states the objective of AGR Soldiers['] professional development is to improve and maintain the skills and qualifications that are required for both pre- and post- mobilization. <u>AGR officers should be aware that they are not guaranteed either 20 years AFS or active duty until reaching their MRD.</u>

(*Id*. at pp. 35–36 (emphasis original).)

The Initial ABCMR Denial Letter concludes, among other things:

- "There is no effective relief that this Board can provide the applicant because the applicant does not qualify for an <u>active duty retirement</u> under any statute, regulation, or plan because he has either not completed the required active years of federal service or does not meet the criteria for other early retirement plans." (*Id*. at p. 39 (emphasis original).)

- "With respect to TERA: . . . TERA does not apply in the applicant's case. His removal from an active status <u>was not a result of non-selection by a promotion selection board or by a force shaping centralized selection board</u>. . . . TERA is used to retire members who are excess to the Service's short term and long term needs and who, absent the availability of TERA, would have been expected to qualify for a 20-year AFS retirement. All Soldiers must meet all eligibility requirements for retirement length of service for a 20-year retirement. Exceptions to other eligibility requirements are not considered. Since he reached his MRD before he would have qualified for a 20-year AFS retirement, he was disqualified for retirement under TERA, even if he had been selected by an AGR REFRAD board or was non-selected for promotion to colonel." (*Id*. at pp. 39–40 (emphasis original.).)

- "With respect to the MRD: . . . His argument regarding not being counseled or notified upon entry into the AGR program or upon completion of the probationary period that he would be removed from active status prior to completing 20 years AFS, does not change the fact that by law, he was required to be removed on 30 June 2014. A review of the evidence shows no error in his MRD calculation. The evidence shows by law he was appropriately removed from both the AGR and the Reserve active status list. . . . With respect to his extensions: . . . No Service personnel are promised or guaranteed 20 years AFS. AGR officer management is structured and managed within the statutory framework of Reserve officer career management laws and is implemented in applicable Army regulations. . . . MRD extensions are based upon the needs of the service, the match of an officer's qualifications to the requirement, the willingness of the officer to perform the

required mission or service, and in some cases, the timing of the requirement with regard to the officer's career. Each application for an MRD extension is reviewed and a determination is made based on multiple factors to include the needs of the Army. The applicant erroneously tried through multiple arguments to show he was not fairly and equitably treated when his MRD extension was denied. The complete facts and circumstances of the other officers whose MRD extension requests were approved are speculative at best by the applicant. This Board is not an investigative board. While the applicant disagrees with the [ASA M&RA] decision, all personnel serve based on the needs of the Army as determine by Congressional manning mandates." (*Id*. at pp. 40–41.)

- "With respect to being retroactively excluded from continued service as a warrant officer by six months due to the Army Reserve G-1's policy directive, dated 21 December 2012: . . . The G-1 policy directive focused on fulfilling the needs of the Army Reserve warrant officer program and was not to be used as an avenue solely for commissioned officers to continue serving in another capacity when faced with impending transfer or discharge due to their MRD. . . . In any case, continued warrant officer service would have required an appointment as a warrant officer. Appointments of commissioned officers and warrant officers are delegated by the President to the Secretary of Defense. Such action is not within the purview of this Board." (*Id*. at p. 41.)

- "The applicant has not shown an error or an injustice nor were the arguments he presented valid when all statutory and regulatory guidance is taken into consideration. He served faithfully for many years as an enlisted Soldier as well as a commissioned officer. He attained the required years of service for a non-regular retirement. He did not attain the required years of service for an AFS retirement. There is no provision in law or rule in the regulation that authorizes him an active duty reduced or 15-year retirement. As he is not authorized AFS retirement, he is not entitled to associated benefits such as 'permanent' Tricare." (*Id*.)

In February 2017, Plaintiff filed a request for reconsideration with the ABCMR identifying how a comparator with a similar fact pattern was given relief in 2004. (Compl. ¶ 2.i.) Plaintiff again argued that the word "shall" in DoD Directive 1205.18 is mandatory, and that because Plaintiff was retained in the AGR program for over six years, it was up to the Army Reserve (not Plaintiff) to retain and manage him to a career (*i.e.*, AFS) retirement. (*Id*.) Plaintiff attaches his request for reconsideration to the complaint. (ECF No. 1-1 at p. 48.) There, he argues in part,

12

- "New evidence: Case AR200410662 . . . shows a fact pattern that responsible leaders throughout this Comparator Officer's AGR service advised he would receive an extension into sanctuary when needed. He was aware of his MRD, was aware of routine extensions of MRD into sanctuary, expected an extension of his MRD to reach sanctuary, and eventually 20 AFS and regular retirement. Sixteen years into his AGR service, the Comparator AGR Officer applied for an MRD extension into sanctuary, with approval of his senior leadership, but was instead separated because of Maximum Service MRD before reaching sanctuary. The ABCMR later reviewed the case and granted this Officer full relief as an exception to policy because 1) leaders thought it to be in the interests of their command when they recommended approval of his extension, and 2) it served the interest of justice and equity to correct the error." (*Id*. at p. 49.)

- Plaintiff's "case meets the exact same fact pattern as shown by the evidence already submitted" because: 1) throughout his 10 years of AGR service, responsible leaders published guidance on retention of AGR Soldiers beyond service MRD and his senior leaders advised him verbally that MRD extension or deployment into sanctuary would be approved as others had been; 2) Plaintiff applied for MRD extension with the recommendations of approval by his senior leadership in order to reach sanctuary but was denied; and 3) Plaintiff knew he would be separated because of MRD before AFS retirement unless he received an extension, but he expected the MRD extension and therefore did not know he would actually be removed because of MRD before AFS retirement. (*Id*. at p. 49–50.)

- The Initial ABCMR Denial Letter's circular argument that Plaintiff should have been removed without AFS retirement because he reached MRD before 20 AFS years ignored Plaintiff's argument that he should have been given an extension of his MRD so that he could have reached 20 AFS years and regular retirement. DoD Directive 1205.18 placed the burden on the service, not the soldier, to ensure that they only keep soldiers on AGR service "that may lead to a military retirement after attaining the required years of Active Federal Service . . . (and that) after 6 years (of AGR service) constitutes retention and shall require subsequent management under a career program[.]" (*Id*. at pp. 50–51.) The ABCMR inaccurately interpreted the word "may" in DoD Directive 1205.18 as "might not," when the nature of the Directive is "to tell the Services what is authorized, and not what 'might not' happen." (*Id*. at 51.)

- The relief Plaintiff requested (partial retirement from June 2014 forward) could be substituted with another remedy of significant value, comparable to five years of additional service and full retirement afterward, or 12 years of partial retirement that he would have been provided had his claim been granted. (*Id*. at p. 50.)

Plaintiff alleges the ABCMR inexplicably denied his request and that their response—

that Plaintiff had reached MRD and was not eligible for relief under TERA—was non-responsive

to his arguments. (Compl. ¶ 2.i.) Plaintiff attaches the ABCMR's letter dated April 25, 2021,

denying his request for reconsideration ("ABCMR's Second Denial Letter"). (ECF No. 1-1 at p.

108.[5]) ABCMR's 20-page Second Denial Letter first summarizes Plaintiff's "request for

reconsideration with new requests," which include in part:

- Reconsideration of Plaintiff's initial application for early retirement based on 15 years of AFS, including immediately eligibility for TRICARE (*id*. at p. 109); and
- Correction of his record to show 5 years of additional active service until 2018 and then entitlement to immediate full retirement. (*Id*.)

The ABCMR's Second Denial Letter then lists the evidence considered by the Board and

summarizes the facts of the case over the course of ten pages. (*Id*. at p. 110.) The Letter

incorporates the military records summarized in the Initial ABCMR Denial Letter and finds that

Plaintiff "provides new evidence and argument that warrants consideration by the ABCMR."

(*Id*.) The Letter describes the comparable case Plaintiff submitted, including the following facts

(among others):

- "The applicant in AR2004106642 was a commissioned officer of the Army National Guard of the United States (ARNGUS) serving in the State of Virginia Army National Guard (VAARNG) in the AGR Program. The applicant whose case is under reconsideration is a member of the U.S. Army Reserve (USAR) who served in the AGR Program." (*Id*.)
- "In the comparable case the applicant requested an extension of his MRD from 8 February 2005 to 10 April 2005. He held the rank of LTD/pay grade 0-5 serving on the staff of the State Headquarters. His MRD was extended under the provisions of Title 10, U.S. Code, section 14702 as an exception to policy. The Board granted his request." (*Id*. at p. 117.)

The ABCMR also noted that it had denied Plaintiff's Initial ABCMR Application in part because

"[t]he ASA M&RA decision denying him an MRD extension was based on congressional

manning mandates." (*Id*.)

---

[5] Plaintiff incorrectly argues that the ABCMR denied his request for reconsideration on June 10, 2021, but that error is immaterial to the analysis in this Opinion.

The ABCMR's Second Denial Letter includes the following analysis and conclusions, among others, in the "Board Discussion" section:

> After reviewing the application, all supporting documents, and the evidence found within the military record, the Board found that relief was not warranted. The applicant's contentions, the military record, and regulatory guidance were carefully considered. The applicant is advised the Board makes recommendations based upon the individual merits of each person's case. Although his case may be similar to another applicant's, the Board may determine the facts and circumstances are not identical; however, the Board did consider the provided case as new evidence. Based upon a preponderance of the evidence, the Board determined there is insufficient evidence to amend the previous Board's decision.

(*Id.* at p. 119.)

Plaintiff alleges that simply because the Army Reserve determined he was not qualified or eligible for the remedies that Plaintiff pursued "**did not release them from the requirement to manage [him] to an Active-Duty (20 years of AFS with immediate annuity) career retirement**" based on the language of DoD Directive 1205.18 and AR 135-18. (Compl. ¶ 2.f. (emphasis original).) Plaintiff claims that **"[t]his is the *gravamen* of [his] complaint that has been unanswered/ignored by the [ABCMR] to date."** (*Id.* (emphasis original).) Plaintiff alleges that the ABCMR's Second Denial Letter "again was non-responsive to this logic, and again *inexplicably* denied [his] request in 2017 stating that [he] reached MRD and was not eligible for relief under TERA." (*Id.* ¶ 2.i. (emphasis original).) Plaintiff further alleges that the issue he brings before this Court is that the ABCMR "**twice ignored the *gravamen* of my claim**[.]" (*Id.* (emphasis original).)

In 2021, Plaintiff "appealed the matter through [his] State and Federal Representatives which again did not result in relief because they could offer no remedy or reasonable explanation for my separation from Active Duty." (*Id.* ¶ 3.d.)

Plaintiff filed the instant lawsuit against the ARBA—the superior organization of the ABCMR—on August 4, 2022. (Resp. 4.)

### IV. Plaintiff's Alleged Injuries

Plaintiff alleges that he voluntarily left his airline career in 2001, then voluntarily accepted an AGR tour in 2004, when he could have instead been an airline captain receiving twice the pay and retirement benefits. (Compl. ¶ 3.a.) Plaintiff expected during his AGR service to be deployed and to reach promotion to colonel, which is what occurred with his immediate predecessor. (*Id.*) Plaintiff instead was released "without a retirement" so late in his career that it was "an injustice from which it was impossible to recover." (*Id.* ¶ 3.b.) Plaintiff contends that if he had gone back to the airlines in 2014, he would have had to start over at the bottom of an airline career that paid new copilots less than $30,000 per year at the time. (*Id.*) Plaintiff secured non-aviation employment at $50,000 per year. (*Id.*) Plaintiff and his family "had to endure the difficulties" of Plaintiff "starting [his] career all over, while having been displaced from [their] hometown and moved four times over 10 years, losing contact with friends and family every time." (*Id.* ¶ 3.c.)

### V. Requested Relief

Plaintiff requests a partial (15-year) retirement, with backpay and interest, effective July 1, 2014, plus any applicable benefits, such as medical coverage and/or Tricare, or the equivalent monetary sum. (*Id.* ¶ 5.) In order to correct Plaintiff's lost expected opportunity for promotion to colonel, Plaintiff requests promotion to colonel effective the date of his retirement, with a ceremony in view of his family and peers. (*Id.*) Plaintiff requests that repayment of the $163,000 separation debt be cancelled due to the harms he endured from undue delay in resolving the matter. (*Id.*)

**LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), a claimant must plead facts that are sufficient to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plausible claim requires factual allegations sufficient to support a "reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must acknowledge all facts provided by the claimant as true; however, any "legal conclusions" should not be accepted as true. *Id*. Pleadings "filed *pro se* [are] to be liberally construed, . . . and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Beal v. Beller*, 847 F.3d 897, 902 (7th Cir. 2017) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).

A "complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations. But dismissal is appropriate when the plaintiff pleads himself out of court by alleging facts sufficient to establish the complaint's tardiness." *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674–75 (7th Cir. 2009); *Shuhaiber v. Dec*, No. 17 C 5331, 2020 WL 6781798, at *1 (N.D. Ill. Nov. 17, 2020).

**DISCUSSION**

### I.    Statute of Limitations

Defendant argues that Plaintiff's action is barred under 28 U.S.C. § 2401(a), which states that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues," except for certain actions not at issue here. The six-year statute of limitations applies to claims brought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06, including military discharge decisions. *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 191 F.3d 845, 853 (7th Cir. 1999) (dictum) ("There is a general six-year statute of limitations for civil actions

against the United States found in 28 U.S.C. § 2401(a), which applies to lawsuits brought pursuant to the APA."), *rev'd on other grounds*, 531 U.S. 159 (2001); *Soble v. Army Bd. of Corr. of Military Records*, 151 F.3d 1033, 1998 WL 516770, at *2 (7th Cir. July 30, 1998) (unpublished table opinion) (the six-year statute of limitations provided in 28 U.S.C. § 2401 "applies to claims alleging error in military discharge decisions").

The parties disagree as to the nature of the cause of action that Plaintiff pleads in his complaint, which is key to the statute of limitations analysis. Defendant argues that Plaintiff complains that the Army Reserve unlawfully discharged him in 2014 when he reached his MRD but waited until 2022 to challenge this discharge in this lawsuit, which is more than six years after the discharge occurred. *See Rempfer v. U.S. Dep't of Air Force Bd. For Corr. of Military Records*, 538 F. Supp. 2d 200, 206 (D.D.C. 2008) ("For claims challenging the discharge itself, the § 2401(a) limitation period begins to run when a service member's discharge is final. In other words, [ABCMR] review does not delay the accrual of a cause of action arising directly from an allegedly illegal discharge." (cleaned up)); *Soble*, 151 F.3d at *2 (noting that the plaintiff's "claim accrued at least as late as his discharge date").

Although Plaintiff filed his complaint *pro se*, Plaintiff is now represented by counsel who filed, on Plaintiff's behalf, the Response and a motion for leave to file a response to Defendant's reply ("Surreply") (ECF No. 39), which the Court grants. Plaintiff's Response and Surreply frame the allegations of the complaint differently. Plaintiff concedes that no one in the Army Reserve had the power to ignore or cancel the MRD set forth in 10 U.S.C. § 14507. Rather, Plaintiff contends that he alleges that several means existed to ensure that he could complete 20 years of active service, such as deploying to Afghanistan until his promotion to colonel or "reverting" to the rank of warrant officer. His leadership tried, but failed, to secure his continued

service by these means. Under 10 U.S.C. § 1552, the ABCMR is empowered to "correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1). Plaintiff argues that the injustice of the Army Reserve's failure to "manage" his career in such a way that Plaintiff could reach AFS retirement, as required by DoD Directive 1205.18, were the basis of his two petitions to the ABCMR. The ABCMR denied Plaintiff's Initial ABCMR Application on March 2, 2016, and his request for reconsideration on April 25, 2021. Plaintiff contends that this lawsuit, filed August 4, 2022, timely challenges the failure of the ABCMR to correct the injustice in Plaintiff's records.

Plaintiff takes the position that his request for review of the ABCMR's denials are brought pursuant to the APA, even if the APA is not expressly named in his complaint. Plaintiff argues that a plaintiff who wishes to challenge actions by a military department in federal court under the APA must first exhaust his remedies and obtain "final agency action." *See* 5 U.S.C. § 704. Plaintiff contends that ABCMR's denials are final agency action, and the six-year statute of limitations does not begin to run until the ABCMR issued its final decision. *See Bienias v. Donley*, No. 12 C 6226, 2014 WL 4922010, at *3 (N.D. Ill. Sept. 30, 2014) ("Under the APA, a right of action accrues at the 'final agency action.'" (quoting 5 U.S.C. § 704)). Plaintiff argues that the issue before this Court is whether the ABCMR's "final" decision was its first one in 2016 or its second one in 2021.

Defendant responds that Plaintiff failed to assert APA claims in the complaint and may not amend his complaint in his response brief. *See Pirelli Armstrong Tire Corp. Retiree Medical Benefits Tr. v. Walgreen Co.*, 631 F.3ed 436, 448 (7th Cir. 2011). Defendant reiterates that Plaintiff's complaint can only be characterized as challenging the 2014 discharge itself because Plaintiff does not identify which of the decisions the ABCMR addressed is at issue, which

military records are at issue (*e.g.*, denial of MRD extension request, denial of deployment request, etc.), and which factors or regulations required those decisions to come out differently. Defendant contends that Plaintiff alleges he was harmed and injured not by ABCMR's failure to correct a specific set of military records, but because he was discharged and released from active duty in the AGR program without the opportunity to reach an AFS retirement. Defendant argues that merely mentioning Plaintiff's administrative appeals does not state a claim that they amount to APA violations, pointing to *Rempfer*, 538 F. Supp. 2d at 203, 206–07 as an analogous case.

In Plaintiff's Surreply, he points out that he filed his complaint *pro se* and is entitled to some leeway. He argues that he has adequately explained the wrong Defendant has done to him and what he wants the Court to do about it, and in the process "present[s] a story that holds together." *Warren v. Shire Pharmaceuticals, LLC*, No. 18-CV-7622, 2018 WL 6324945 at *1 (N.D. Ill. Dec. 4, 2018) (citing *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010)); *see also* Fed R. Civ. P. 8. Although Plaintiff cited the statutory basis for relief (the APA) for the first time in his Response, he submits that the facts and nature of the case remain unchanged.

The Court agrees with Plaintiff that his complaint is in the style of an APA claim. "To understand the effect of [ABCMR] review on the statute of limitations, it is necessary to keep in mind that there are two kinds of claims that can be brought by a service member challenging his discharge." *Rempfer*, 538 F. Supp. 2d at 206. "A claim seeking review of the underlying discharge is distinct from a claim seeking review of an adverse decision by a Corrections Board—'the focus of the former is on the action of discharge officials whereas the focus of the latter is on the action of the [Corrections] Board.'" *Id*. (quoting *Kendall v. Army Bd. For Corr. of Military Records*, 996 F.2d 362, 366 (D.C.Cir. 1993)).

The facts of the complaint are sufficient to put Defendant on notice that Plaintiff is attempting to allege a "legal wrong because of agency action" or that he was "adversely affected or aggrieved by agency action[.]" 5 U.S.C. § 702. "Agency action" is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]" 5 U.S.C. §§551(13), 701(b)(2). More specifically, Plaintiff alleges with emphasis that the issue he brings before this Court is that the ABCMR "twice ignored the *gravamen* of [his] claim," namely, that the Army Reserve is required by DoD Directive 1205.18 and AR 135-18 to "manage" Plaintiff's career to an AFS retirement. Plaintiff's claims focus on the actions of the ABCMR. Whether Plaintiff adequately states an APA claim regarding the ABCMR's actions, however, is a separate inquiry discussed below. For the purposes of determining the *nature* of Plaintiff's claim in order to determine when the statute of limitations began to run, it is in the nature of an APA claim.[6]

Having determined that Plaintiff brings an APA claim that the ABCMR failed to correct an injustice in his records, the Court next considers whether the ABCMR's "final" decision was its first one in 2016 or its second one in 2021. Plaintiff points to unpublished decisions from the Seventh Circuit and the district courts therein that he contends establish a framework for resolving the issue. Plaintiff argues that if the ABCMR denies relief and a petitioner seeks reconsideration, what happens to the time limit depends on the circumstances. If the petitioner brings no new materials, and the ABCMR denies review on that basis, then the limitations period continues to run from the date of original denial. Plaintiff argues this was the situation in *Soble*,

---

[6] To the extent Plaintiff's complaint also includes allegations that focus on the action of discharge official(s), any claim seeking review of the underlying discharge—which occurred more than six years before the filing of this suit—is time-barred. *See Soble*, 151 F.3d at *2 (plaintiff's unlawful discharge "claim accrued at least as late as his discharge date"); *Rempfer*, 538 F. Supp. 2d at 206 ("Board of Corrections review does not delay the accrual of a cause of . . . action arising directly from an allegedly illegal discharge.").

*supra*. If the petitioner does bring new arguments, and the ABCMR reopens the case and considers the merits of the new arguments, then the ABCMR's new decision becomes the agency's final action, and the limitations period starts over. Plaintiff states that this was the situation in *Bienas v. Donely*, No. 12 C 6226, 2014 WL 4922010 at *4 (N.D. Ill. Sep. 30, 2014) and matches the approach in *Green v. White*, 319 F.3d 560, 566–67 (3d Cir. 2003).

Plaintiff argues that the facts of the instant case line up with *Bienas*, not *Soble*, and so the six-year limitations period began to run when the ABCMR made its final decision on April 25, 2021, and this action—filed approximately 14 months later—is not time barred. More specifically, Plaintiff points to his request for reconsideration in which he referred the ABCMR to a precedent they had not considered (ABCMR Case No. AR 2004 1006642) and argued the similarities between his case and that one. Plaintiff points to the ABCMR's Second Denial Letter, which specifically acknowledged that "[t]he applicant provides new evidence and argument that warrants consideration by the ABCMR."

Defendant argues that even if Plaintiff's complaint could be characterized as an APA claim, the limitations period has run regardless. Defendant argues that Plaintiff misreads *Soble*, which Defendant contends stands for the principle that "the § 2401(a) six-year time limit begins to run with the first ABCMR decision and is unaffected by subsequent motions for reconsideration"—even ones presenting new evidence. *Green*, 319 F.3d at 565 (discussing *Soble*, *supra*).

But *Green* went on to "conclude that any petition for rehearing to the ABCMR which does not include 'new evidence' or reflect some 'changed circumstances' does not re-start the six-year statute of limitations[, but] [i]f however, the ABCMR re-opens a proceeding and rules upon a petition *that does contain such new evidence*, such a ruling will constitute a final agency

action and will re-start the six-year time limit." *Id* at 566. (emphasis added). The *Green* court

noted that its decision "is consistent with . . . the Court of Appeals for the Seventh Circuit's

holding in *Soble*," because "none of [the requests for reconsideration in *Soble*] alleged any new

evidence or changed circumstances . . . so the [*Soble*] Court properly found that the final

administrative decision in the case was the initial ABCMR ruling, not the Board's rejection of

Soble's petitions for reconsideration." *Id*. at 567.

Here, Plaintiff again has the better argument. The ABCMR's denial of the request to

reconsider specifically acknowledged that "[t]he applicant provides new evidence and argument

that warrants consideration by the ABCMR." Defendant's argument that "new evidence" must

have been previously unavailable is unavailing. Regulations governing the ABCMR state, in

pertinent part,

> (4) Reconsideration of ABCMR decision. An applicant may request the ABCMR
> to reconsider a Board decision under the following circumstances:
>
> (i) If the ABCMR receives the request for reconsideration within 1 year of the
> ABCMR's original decision and if the ABCMR has not previously reconsidered
> the matter, the ABCMR staff will review the request to determine *if it contains
> evidence (including, but not limited to, any facts or arguments as to why relief
> should be granted) that was not in the record at the time of the ABCMR's prior
> consideration*. If new evidence has been submitted, the request will be submitted
> to the ABCMR for its determination of whether the new evidence is sufficient to
> demonstrate material error or injustice. If no new evidence is found, the ABCMR
> staff will return the application to the applicant without action.

32 C.F.R. § 581.3(4)(i) (emphasis added).

By contrast, the regulations governing the Air Force Board of Correction of Military

Records (which the Court only mentions by way of comparison) state that that Board "may

reconsider an application if the applicant submits newly discovered relevant evidence *that was

not reasonably available when the application was previously considered*. . . . New arguments

about, or analysis of, evidence already considered, and additional statements which are

cumulative to those already in the record of proceedings will not be considered new evidence." 32 C.F.R. § 865.6(a) (emphasis added).

The regulations governing ABCMR requests for reconsideration indicate that the ABCMR will reconsider evidence "that was not in the record at the time of the ABCMR's prior consideration" and do not expressly limit reconsideration to evidence that "was not reasonably available when the application was previously considered." In Plaintiff's case, the ABCMR did not "return the application to the applicant without action[,]" as it would do "[i]f no new evidence is found." Rather, the ABCMR considered Plaintiff's request for reconsideration as containing "new evidence," evaluated the evidence to determine whether it was "sufficient to demonstrate material error or injustice," and issued a decision on the merits of Plaintiff's request on April 25, 2021. The ABCMR's April 25, 2021, decision is the "final" decision with which Plaintiff's APA right of action accrued. The instant lawsuit, filed less than six years later in August 2022, is therefore timely.

## II.    Plaintiff Fails to State a Claim for Relief

Defendant argues in the alternative that Plaintiff fails to adequately state an APA claim. As explained above, Plaintiff challenges both the refusal of the ABCMR to grant his requested relief and its failure to articulate a sufficient basis for its refusal.

Pursuant to the APA, "the reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be--

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**(B)** contrary to constitutional right, power, privilege, or immunity;

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

**(D)** without observance of procedure required by law;

24

**(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

**(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."

5 U.S.C. § 706(2)(A). "In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706(2). "A district court reviewing an agency action under the APA's arbitrary and capricious standard does not resolve factual issues." *Akpan v. Cissna*, 288 F. Supp. 3d 155, 163 (D.D.C. 2018) (punctuation and citation omitted). "Instead, the entire case on review is a question of law and can be resolved on the agency record in the context of a motion to dismiss under Rule 12(b)(6)." *Id*.

"When determining whether an agency's decision is arbitrary or capricious, we ask whether the agency [1] has relied on factors which Congress had not intended it to consider, [2] entirely failed to consider an important aspect of the problem, [3] offered an explanation for its decision that runs counter to the evidence before the agency, or [4] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Zero Zone, Inc. v. U.S. Dep't of Energy*, 832 F.3d 654, 668 (7th Cir. 2016) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007)). "Further, the reviewing court should not attempt itself to make up for deficiencies in the agency's reasoning; we may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id*. (cleaned up) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). A court "will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs.*, 463 U.S. at 43.

25

Here, Plaintiff argues that the ABCMR's refusal to grant relief was arbitrary and capricious because the ABCMR "twice ignored" the "gravamen" of his claim: namely, that even though the Army Reserve determined Plaintiff was not qualified or eligible for the various remedies that Plaintiff pursued in an attempt to achieve an AFS retirement, that did not release it from its obligatory burden to manage Plaintiff's career—as an AGR servicemember with over six years of AFS—to an AFS retirement based on the language of the DoD Directive 1205.18 and AR 135-18. At bottom, Plaintiff claims that the ABCMR failed to consider and respond to his interpretation of DoD Directive 1205.18 and AR 135-18.

### A. Initial ABCMR Denial Letter

Beginning with the Initial ABCMR Denial Letter, the Court considers the two most salient factors: whether the ABCMR "offered an explanation for its decision that runs counter to the evidence before the agency" and "failed to consider an important aspect of the problem." *Zero Zone*, 832 F.3d at 668. The ABCMR first summarizes Plaintiff's evidence and argument over the course of 17 pages, adding, at times, its own commentary and citations to additional authority in response. The discussion and decision section spans three pages. The ABCMR states that Plaintiff seeks a 15-year AFS retirement with Tricare benefits but concludes that "[t]here is no effective relief that this Board can provide the applicant because the applicant does not qualify for an <u>active duty retirement</u> under any statute, regulation, or plan because he has either not completed the required active years of federal service or does not meet the criteria for other early retirement plans."

In so deciding, the ABCMR effectively adopted the interpretation of DoD Directive 1205.18 paragraph 4.7 set forth in the ODCS advisory opinion by interpreting "may" as conditional, in direct contrast with "will":

As he indicates, DOD Directive 1205.18, subject: FTS to the Reserve Components, states, "AGR programs in each Military Service will be administered as career programs that may lead to a military retirement after attaining the required years of AFS." *It is important to note the guidance states "may" rather than "will" lead to a military retirement. This is because there can be no guarantee or statement of a Service member's prequalification for retirement solely for entry into or continuation beyond the probationary period in the AGR program.* Each Service member must attain 20 years of AFS in order to be qualified for retirement based on sufficient length of service. *Upon entry into the AGR Program, no AGR personnel are guaranteed an AFS retirement*.[7]

By comparison, Plaintiff's interpretation is best summarized by quoting from his

argument to the ABCMR:

ODCS, G1 addresses in their seventh paragraph what I consider to be the heart of the matter. . . . In considering this one should know policies that establish the Service are not written to tell what cannot be done, but what can or should be done. Specifically, the ODCS, G1 opinion misses the point of the whole paragraph, which is to prescribe to the Services categories of AGR service for which Congress has funded, the third of which being AGR Soldiers chosen to be kept beyond 6 years. It goes on to stipulate that these candidates "shall" be deemed <u>by the Service</u> to be *able* to reach AFS retirement. In other words, the Services are allowed to keep an AGR Soldier beyond 6 years given that they (the Soldier) "may" reach AFS retirement in the *permissive* sense. The directive places the requirement to make this determination on the Services, not the Soldier – hence the nature of the directive is not to address Soldier pay, benefits, or retirement per se. In doing so, it protect[s] Soldiers from abuse by the Services by using the word "may" in the *permissive* sense, not the *conditional* sense as their opinion would have it. "May" does not mean "might" in the *conditional* sense because it is not speaking to the variable eligibility of the Soldier. If DOD had meant to allow for this, they would have added a fourth category to include "those who serve beyond 6 years without the possibility of reaching AFS retirement."

For the reasons that follow, the ABCMR's interpretation of DoD Directive 1205.18 is facially

reasonable, while Plaintiff's interpretation is not reasonable for multiple reasons.

Plaintiff argues that the word "may" in DoD Directive 1205.18 is "permissive" not

"conditional." To best illustrate the Court's understanding of what Plaintiff means by

---

[7] Although the ABCMR quoted DoD Directive 1205.18 as using the word "will" instead of "shall," the version that Plaintiff relies upon and attaches to the complaint uses the word "shall" and so the Court hereafter uses Plaintiff's version. The difference is immaterial to the reasoning herein.

"permissive," it is helpful to analogize to language common in contracts. For example, the
Seventh Circuit considered the following contractual language: "Upon default . . . Mortgagee
*may, at its sole option without any prior approval of Mortgagor*, notify any or all tenants to pay
directly to Mortgagee all rent, issues, and profits arising out of the property . . . ." *Matter of
Century Inv. Fund VIII Ltd. P'ship*, 937 F.2d 371, 374 (7th Cir. 1991) (emphasis added). The
court there found that "the right of the mortgagee . . . is permissive, not required." While the
language of the contract at issue in *Matter of Century* differs from that in DoD Directive
1205.18, the Court nonetheless finds it helpful in its effort to elucidate what Plaintiff means
when he argues that "may" is permissive and deems servicemembers to be "able" to reach AFS
retirement—in other words, at the servicemember's (not the Army's) option.

Defendant argues that "the word 'may' operates on the words 'career programs,' not (as
Plaintiff contends) on the personnel in these programs, and makes clear that a military retirement
is a *possible* benefit only *after* a soldier attains 'the required years of active Federal service.'"
(Reply 6 (emphasis original) (citing Black's Law Dictionary (11th ed. 2019) (defining "May" as
"To be a possibility")).) The Court agrees with Defendant. Plaintiff's interpretation of the word
"may" might be more plausible if the sentence stated: "AGR programs in each Military Service
shall be administered as career programs *in which Soldiers may, at their sole option, achieve a
military retirement after attaining the required years of active Federal Service.*" But of course,
that is not what DoD Directive 1205.18 says. As Defendant argues, "may" operates on "career
programs," and it would be nonsensical if "may" operated to bestow a right to choose on an
abstract concept like "career programs." Only by interpreting the word "may" as conditional
does the sentence make sense grammatically.

Plaintiff's interpretation also relies on an unreasonably narrow understanding of the phrase "military retirement" as AFS retirement. Plaintiff does not point to any authority in support. On the other hand, Defendant points out that a military career offers different levels of retirement as possible benefits for employees after they satisfy certain conditions. DoD Directive 1205.18 does not define "military retirement;" nor does the DoD Dictionary of Military and Associated Terms ("DoD Dictionary"). *See* DoD Dictionary, Homeland Security Digital Library, available at https://www.hsdl.org/c/view?docid=886178. But Plaintiff himself is entitled to non-regular retired pay at age 60, which is a form of retirement pay that is earned after completing 20 years of qualifying service. There is no apparent justification for reading "military retirement" so narrowly as to only include AFS retirement—one of multiple types of retirement pay achievable by servicemembers. Absent any such limiting language, it appears that Plaintiff *did* receive a military retirement—just not the one he wanted.

Next, Plaintiff's interpretation depends on interpreting the word "shall" in DoD Directive 1205.18 as mandatory. But it is axiomatic that even "[t]he legislature's use of terms such as 'shall' and 'must,' rather than 'may,' does not automatically require that the provision be construed as mandatory[.]" *Milwaukee Cnty. v. Donovan*, 771 F.2d 983, 990 (7th Cir. 1985). Rather, "[a] variety of factors should be considered in determining the effect to be given the statute, including whether a mandatory construction would yield harsh or absurd results." *Bartholomew v. United States*, 740 F.2d 526, 531 (7th Cir. 1984). Plaintiff's interpretation would lead to absurd results, imposing duties on each Military Service—defined to include "the Army, the Navy, the Air Force, the Marine Corps and the Coast Guard," *see* DoD Directive 1205.18 E1.1.6—to take any affirmative, particularized steps necessary to ensure that any servicemember with more than six years of AGR service is able to attain 20 years of AFS. Plaintiff's

interpretation would impose a heavy burden on the Military Service based only on a tenuous leap of logic that relies on a nonsensical interpretation of the word "may" and an unjustifiably narrow interpretation of the phrase "military retirement." Further, Plaintiff's otherwise-unreasonable interpretation would directly contradict the plain and unambiguous language of AR 140-30, which states, "AGR officers should be aware that they are not guaranteed either 20 years active Federal service or active duty until reaching MRD." AR 140-30 § 6-1.

Plaintiff argues (without citation to authority) that the purpose of paragraph 4.7 in DoD Directive 1205.18 is to prescribe the three categories of AGR service that Congress has funded, the third of which being AGR servicemembers chosen to be kept beyond six years who "may" (*i.e.*, are able to) reach "military retirement" (*i.e.*, AFS retirement). Plaintiff argues that DoD could have, but did not, include a fourth category of servicemembers who serve beyond six years without the possibility of reaching AFS retirement. Plaintiff's argument presupposes that the language of DoD Directive 1205.18 confers an entitlement to AGR servicemembers who serve beyond six years to be able to achieve an AFS retirement, which runs into the problems identified above. Further, the DoD would have no need to include a "fourth category" that is already subsumed within the so-called "third category" of AGR servicemembers.

Next, Plaintiff attempts to support his interpretation of DoD Directive 1205.18 by interpreting "career program(s)" and "management under a career program" as achieving 20 years of AFS and therefore an AFS retirement. He argues that this interpretation is supported by AR 135-18 § 1-6(d), which states, "This regulation provides for—[among other things,] . . . [e]ntry into the program of soldiers who may desire to serve only initial or occasional tours, as well as soldiers who serve in a career status." AR 135-18 § 1-6(d). Plaintiff does not expand upon his reasoning. The Court infers that that Plaintiff focuses on the juxtaposition in AR 135-18

§ 1-6(d) between "career status" soldiers and soldiers who "desire to serve only initial or occasional tours"—a juxtaposition that exists in DoD Directive 1205.18 as well. Perhaps Plaintiff is attempting to argue that because DoD Directive 1205.18 establishes that service in AGR status for more than six years "constitutes retention and shall require subsequent management under a career program," and (per Plaintiff's interpretation) requires AGR career programs to lead to an AFS retirement, then AR 135-18 § 1-6(d)'s similar use of the phrase "career status" (as juxtaposed to "initial or occasional tours") also means achieving AFS retirement.

Plaintiff's interpretation of AR 135-18 is convoluted at best and fatally circular—in other words, it is not a reasonable reading of the plain language of AR 135-18. Plaintiff's interpretation of AR 135-18 requires interpreting the phrase "management under a career program," and therefore "career status," as meaning achieving 20 years of AFS and an AFS retirement. First, for the reasons explained above, there is nothing in the plain language of DoD Directive 1205.18 that imposes a requirement upon the Army to ensure AGR servicemembers with over six years of AGR service be able to achieve an AFS retirement. To the extent Plaintiff's construction of AR 135-18 relies upon his unreasonable interpretation of DoD Directive 1205.18, that construction is also unreasonable. Second, there is nothing to suggest "career status" in AR 135-18 means achieving AFS retirement. Neither DoD Directive 1205.18 nor AR 135-18 specifically define "career," "career programs," or "career status." The Dictionary of United States Army Terms, which supplements the DoD Dictionary, defines "career management" and "career planning" with the same definition: "Providing for the maximum development of an individual's inherent abilities, aptitudes, and interests, as well as for the best utilization of their acquired skills and accumulated knowledge." AR 310-25 (eff. Oct. 15, 1986). Notably, this definition does not

define "career management" as being able to reach an AFS retirement. While "career management" and "management under a career program" are not identical phrases, it is too far of a stretch to interpret "management under a career program" as meaning achieving AFS retirement based on nothing other than Plaintiff's say-so.

The Initial ABCMR Denial Letter does not directly address AR 135-18. It does, however, point to AR 140-30, which plainly and unambiguously states, "AGR officers should be aware that they are not guaranteed either 20 years active Federal service or active duty until reaching MRD." AR 140-30 § 6-1. That regulation more broadly states that one of its purposes is to "implement[] the provisions of . . . AR 135-18 for USAR." AR 140-30 § 1-2(d). Where a "regulation then just means what it means . . . the court must give it effect, as the court would any law." *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019). The upshot of AR 140-30 § 6-1 is that Plaintiff—an AGR officer—was not guaranteed 20 years of AFS in order to achieve an AFS retirement before reaching MRD.

Even if Plaintiff's interpretation of DoD Directive 1205.18 were reasonable, however, that would only create an ambiguity in the language between two reasonable interpretations. If, "after a court has resorted to all the standard tools of interpretation," the language of an agency's rule is "genuinely ambiguous," courts presumptively give deference to an agency's reading of its own rule unless "the reasons for that presumption do not apply, or countervailing reasons outweigh them[.]" *Kisor*, 588 U.S. at 573 (explaining the contours of *Auer* deference). Here, there is no apparent reason why the ABCMR's reasonable interpretation of DoD Directive 1205.18—which effectively adopts the interpretation set forth in the Army ODCS's advisory opinion—should not receive *Auer* deference. *See id*. at 576–79 (setting forth the various reasons why a reasonable agency reading might not receive *Auer* deference).

For all of these reasons, the ABCMR's explanation of its interpretation of DoD Directive 1205.18 in the Initial ABCMR Denial Letter was not counter to either the evidence that was before it or applicable regulations and rules. Nor is it "so implausible that it could not be ascribed to a difference in view or the product of agency expertise[,]" or reliant "on factors which Congress had not intended it to consider." *Zero Zone*, 832 F.3d at 668.

Defendant argues—and the Court agrees—that the ABCMR articulated its decisions sufficiently such that Plaintiff understood the reasons his claim was rejected. The allegations of Plaintiff's complaint and request for reconsideration to the ABCMR make plain that he understood the ABCMR's position even if he did not agree with it. (*See* Compl. ¶ 4.a. ("Their answers to my appeals interpret the word '***may***' in the policy in a way that erroneously <u>conflates</u> the meaning of it with the potential that an AGR Soldier with over 6 years of AGR service '*might or might not – receive an AFS retirement*." They assert that '***may***' means the retirement is a possibility, not a guarantee." (emphasis original)); ECF No. 1-1 at p. 51 (arguing the ABCMR "poses an assertion, and not a fact, that the wording in the DoD policy that the word [*sic*] 'may' meant 'might not'").) Plaintiff's grievance with the Initial ABCMR Denial Letter—that the ABCMR ignored the "gravamen" of his application—cannot support a claim that the ABCMR's denial of Plaintiff's application was arbitrary and capricious.

Plaintiff concedes that no one in the Army Reserve had the power to ignore or cancel the MRD set forth in 10 U.S.C. § 14507. Accordingly, ABCMR's ultimate conclusion that "[t]here is no effective relief that this Board can provide the applicant because the applicant does not qualify for an <u>active duty retirement</u> under any statute, regulation, or plan because he has either not completed the required active years of federal service or does not meet the criteria for other early retirement plans" is supported by the applicable regulations and evidence, is plausible, did

not fail to consider any important aspect of the problem, and is not arbitrary and capricious. *See Peavey v. United States*, 128 F. Supp. 3d 85, 103 (D.D.C. 2015) (finding plaintiff failed to allege that ABCMR's decision denying plaintiff's request to correct military records was arbitrary and capricious), *aff'd,* No. 15-5290, 2016 WL 4098768 (D.C. Cir. July 12, 2016).

## B. ABCMR's Second Denial Letter

After receiving the Initial ABCMR Denial Letter, Plaintiff submitted a request for reconsideration to the ABCMR. Plaintiff reiterated his arguments regarding DoD Directive 1205.18, which are discussed at length above. Plaintiff also submitted "new evidence"—namely, ABCMR Case No. AR 2004 1006642, which Plaintiff argued,

> shows a fact pattern that responsible leaders throughout this Comparator Officer's AGR service advised he would receive an extension into sanctuary when needed. He was aware of his MRD, was aware of routine extensions of MRD into sanctuary, expected an extension of his MRD to reach sanctuary, and eventually 20 AFS and regular retirement. Sixteen years into his AGR service, the Comparator AGR Officer applied for an MRD extension into sanctuary, with approval of his senior leadership, but was instead separated because of Maximum Service MRD before reaching sanctuary. The ABCMR later reviewed the case and granted this Officer full relief as an exception to policy because 1) leaders thought it to be in the interests of their command when they recommended approval of his extension, and 2) it served the interest of justice and equity to correct the error.

Plaintiff further argued that his own "case meets the exact same fact pattern as shown by the evidence already submitted" because: (1) throughout his years of AGR service, responsible leaders published guidance on retention of AGR soldiers beyond MRD and his senior leaders advised him verbally that MRD extension or deployment into sanctuary would be approved as others had been; (2) Plaintiff applied for MRD extension with the recommendations of approval by his senior leadership in order to reach sanctuary but was denied; and (3) Plaintiff knew he would be separated because of MRD before AFS retirement unless he received an extension, but

he expected the MRD extension and therefore did not know he would actually be removed because of MRD before AFS retirement.

The ABCMR denied Plaintiff's request for reconsideration. In the case before this Court, Plaintiff argues that the denial was arbitrary and capricious because the ABCMR's Second Denial Letter only provided four paragraphs of discussion, and only one of those paragraphs addressed the new comparator case that Plaintiff submitted with his request for reconsideration. (Resp. 11.)

The Court again begins its arbitrary and capricious analysis by considering the two most salient factors to this case: whether the ABCMR "offered an explanation for its decision that runs counter to the evidence before the agency" and "failed to consider an important aspect of the problem." *Zero Zone*, 832 F.3d at 668. As noted above, the ABCMR found that Plaintiff's request for reconsideration "provides new evidence and argument that warrants consideration by the ABCMR"—namely, the so-called comparator ABCMR Case No. AR 2004 1006642.

In one of four paragraphs of discussion, the ABCMR reasoned and found,

> After reviewing the application, all supporting documents, and the evidence found within the military record, the Board found that relief was not warranted. The applicant's contentions, the military record, and regulatory guidance were carefully considered. The applicant is advised the Board makes recommendations based upon the individual merits of each person's case. Although his case may be similar to another applicant's, the Board may determine the facts and circumstances are not identical; however, the Board did consider the provided case as new evidence. Based upon a preponderance of the evidence, the Board determined there is insufficient evidence to amend the previous Board's decision.

Plaintiff argues that that paragraph is pure boilerplate and merely stated that the ABCMR had considered everything, may determine that the earlier applicant's circumstances were different without saying how they were different or how that difference mattered, and gave its ruling. Plaintiff argues that this falls far short of the "satisfactory explanation" required. *See*

*Motor Vehicle Mfrs.*, 463 U.S. at 43. Although "the reviewing court should not attempt itself to make up for deficiencies in the agency's reasoning" or "supply a reasoned basis for the agency's action that the agency itself has not given[,]" *Zero Zone*, 832 F.3d at 668 (cleaned up) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43), a court "will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs.*, 463 U.S. at 43.

Here, the ABCMR addressed the comparator case Plaintiff submitted and concluded "[b]ased upon a preponderance of the evidence, . . . there is insufficient evidence to amend the previous Board's decision." In its previous decision, the ABCMR had considered Plaintiff's argument that his request for an MRD extension was denied where the requests of comparable officers were granted and effectively adopted the language of the ODCS's advisory opinion:

> MRD extensions are based upon the needs of the service, the match of an officer's qualifications to the requirement, the willingness of the officer to perform the required mission or service, and in some cases, the timing of the requirement with regard to the officer's career. Each application for an MRD extension is reviewed and a determination is made based on multiple factors to include the needs of the Army.

And in the ABCMR's Second Denial Letter, it summarized its previous denial respecting the MRD extension request as based on "[t]he ASA M&RA decision denying him an MRD extension [which] was based on congressional manning mandates."

The ABCMR's Second Denial Letter stated its rationale for concluding there was insufficient evidence to amend its previous decision: "the Board makes recommendations based upon the individual merits of each person's case" and "[a]lthough his case may be similar to another applicant's, the Board may determine the facts and circumstances are not identical[.]" It is reasonable to infer from these statements that the ABCMR found the comparator case was distinguishable from Plaintiff's case. Although the ABCMR could certainly have connected the dots more overtly, its "path may reasonably be discerned." *Motor Vehicle Mfrs.*, 463 U.S. at 43.

The ABCMR's Second Denial Letter identified the following facts, among others, from the comparator case:

- "The applicant in AR2004106642 was a commissioned officer of the Army National Guard of the United States (ARNGUS) serving in the State of Virginia Army National Guard (VAARNG) in the AGR Program. The applicant whose case is under reconsideration is a member of the U.S. Army Reserve (USAR) who served in the AGR Program."
- "In the comparable case the applicant requested an extension of his MRD from 8 February 2005 to 10 April 2005. He held the rank of LTD/pay grade 0-5 serving on the staff of the State Headquarters. His MRD was extended under the provisions of Title 10, U.S. Code, section 14702 as an exception to policy. The Board granted his request."

The applicant in ABCMR Case No. AR 2004 106642 was serving on the staff of the Headquarters for the State of Virginia. His MRD was extended pursuant to 10 U.S.C. § 14702 as an exception to policy, which provides, "the Secretary of the military department concerned may, with the officer's consent, retain on the reserve active-status list an officer in the grade of major, lieutenant colonel, colonel, or brigadier general who is—(1) an officer of the Army National Guard of the United States and assigned to a headquarters or headquarters detachment of a State[.]" 10 U.S.C. § 14702(a)(1). Plaintiff does not allege that he was an officer of the Army National Guard of the United States assigned to a headquarters or headquarters detachment of a State, or that he sought an MRD extension pursuant to 10 U.S.C. § 14702. The statute by which the applicant in ABCMR Case No. AR 2004 106642 was granted an MRD extension appears to be inapplicable to Plaintiff.

Plaintiff relies on *Local 777, Democratic Union Organizing Committee, Seafarers International Union of North America, AFL-CIO v. N. L. R. B.*, which found that the NLRB's statement, "suffice it to say that (cases coming to the opposite conclusion that such lessees are not employees) Must [*sic*] be narrowly construed. . . [,]" along with "the factual recitations which lead merely to the conclusory judgment," fell "far short of the reasoned analysis or

37

satisfactory explanation that an agency must give when it seeks to ignore a line of precedential decisions and change the law established by judicial decisions." 603 F.2d 862, 893–94 (D.C. Cir. 1978), *opinion adhered to on denial of reh'g,* (D.C. Cir. June 20, 1979). But here, the ABCMR's Second Denial Letter did not "ignore a line of precedential decisions and change the law established by judicial decisions." *Id. Local 777* is therefore distinguishable.

Finally, Plaintiff argues that the ABCMR again ignored his interpretation of DoD Directive 1205.18 and AR 135-18. Plaintiff did not offer any new argument on that issue in his request for reconsideration that was not argued in his Initial ABCMR Application. And, for the reasons explained above, the ABCMR's Initial Denial Letter's interpretation of DoD Directive 1205.18 and ultimate decision to deny Plaintiff's application was not arbitrary and capricious. Therefore, the ABCMR was not remiss in not addressing the same arguments that it had already considered and addressed.

The Court finds that the ABCMR's conclusion that "there is insufficient evidence to amend the previous Board's decision" is supported by a sufficient explanation that does not "run[] counter to the evidence before the agency" or "fail[] to consider an important aspect of the problem." *Zero Zone*, 832 F.3d at 668. Nor is there any basis to find that the ABCMR's explanation "relied on factors which Congress had not intended it to consider" or is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* Accordingly, Plaintiff fails to state a claim that the ABCMR's Second Denial Letter is arbitrary and capricious and so fails to state a claim under the APA.

## CONCLUSION

Defendant's motion to dismiss [25] is granted. Plaintiff's motion for leave to file a response [39] to Defendant's reply brief is granted. Plaintiff may file an amended complaint within 30 days of the date of this Opinion.

SO ORDERED.                                    ENTERED:  June 26, 2024

_____
JORGE L. ALONSO
United States District Judge